**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MUHAMMAD SAJID,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **MOHAMMAD IJAZ AND SHAISTA IJAZ,** | **NO. 18-1899** |
| **Defendants.** | |

## MEMORANDUM OPINION

Muhammad Sajid ("Plaintiff") asserts that Mohammad and Shaista Ijaz (collectively "Defendants") agreed to sell him their gas station; accepted his payment for the gas station; but subsequently claimed the agreement only entailed allowing Plaintiff to run the gas station as an independent contractor. Plaintiff also asserts that when the parties' relationship fell apart, Defendants ordered Plaintiff off the property and did not return Plaintiff's payment.

Following a bench trial, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT[1]

### A. The Sale

In August 2016, Defendant Mohammad Ijaz placed an advertisement in the *Urdu Times*, a weekly Urdu-language community newspaper, listing an "urgent sale" of a gas station in West Chester, Pennsylvania. The advertisement did not list a price. The gas station was owned by

---

[1] These findings of fact are based on the parties' proposed findings of fact, testimony given at the bench trial, and exhibits entered into evidence at the bench trial. Unless otherwise noted, the facts are undisputed. Where the facts are disputed and "[t]he Court must decide, based on credibility, which party's version to accept[,]" *Finneman v. SEPTA*, 308 F. Supp.3d 855, 858 (E.D. Pa. 2018), the Court almost uniformly accepts Plaintiff's version of the facts as more credible than Defendants' version. In such instances, the Court's finding is presented in the body of the opinion, and Defendants' alternative version of the facts is noted in an accompanying footnote.

Mr. Ijaz's wife, Defendant Shaista Ijaz. Defendants did not own the land on which the gas station was located; they leased it from a third-party landlord on a five-year term (with the option for two additional 5-year extensions). Defendants' lease agreement allowed them to sublease the property only with the landlord's consent—they came to understand at some point that their landlord was unwilling to assent to any sublease of the property. Defendants have owned, operated, or managed between 10 and 15 separate gas stations.

Plaintiff Muhammad Sajid saw the *Urdu Times* advertisement sometime in mid-August 2016. At the time he saw the advertisement, he was working as a limousine driver in New York. He had held that job for thirty years, owned his own car and the car's taxi medallion, and possessed a commercial license. He worked 16-17 hours per day, seven days per week, and typically brought in between $1,000 and $1,200 per week. In 2016, as work slowed, he began looking for another business to own. Although he had no connection to Pennsylvania and did not know anyone there, after consulting with his family, Plaintiff called the number listed on the advertisement.

During that first conversation, Mr. Ijaz indicated he would prefer to meet in person so that Plaintiff and his family could inspect the gas station. So they – Plaintiff and his family – visited Defendants at the gas station sometime in late August or early September 2016. During that first visit, Mr. Ijaz represented that Plaintiff could buy the gas station (including the gas currently in the ground), attached convenience store, inventory, and equipment for $50,000. Eventually this sum became $45,000, although the process by which that happened is unclear. Plaintiff then consulted with additional family members, including his brother, whom Plaintiff asked to lend him money for the purchase. Plaintiff's brother agreed.

On September 4, 2016, Plaintiff and his family again visited the gas station and Defendants. During that meeting, Mr. Ijaz showed Plaintiff what were understood to be receipts from the previous year's sales, which indicated convenience store revenue ranging from $1,200 to $1,400 per day. Mr. Ijaz also represented to Plaintiff that he typically sold almost 3,000 gallons of gasoline per day, and that he made 40 cents per gallon in profit on gasoline sales (for a total, presumably, of close to $1,200 per day in profit from gasoline sales). Defendants did not inform Plaintiff that the business itself was owned by Mrs. Ijaz, not Mr. Ijaz. They also did not inform Plaintiff that, according to the terms of Defendants' lease agreement with their landlord, Defendants' ability to transfer the business to Plaintiff was contingent upon their landlord agreeing to a sublease.

Once Plaintiff agreed to purchase the gas station, Mr. Ijaz told him that, for various reasons—including the desire to avoid certain tax burdens—Mr. Ijaz wanted him to send the purchase money to two of Mr. Ijaz's nephews living in Pakistan, in the form of Pakistani rupees. Mr. Ijaz provided Plaintiff with their names and contact information. At Mr. Ijaz's request, Plaintiff then had his brother make three separate wire transfers to Mr. Ijaz's nephews, over the course of about a week—he sent one nephew a payment of about $6,000, and he sent the other nephew two payments of about $19,000 and $16,000. Plaintiff also paid Mr. Ijaz $5,000 in cash, in United States dollars. While the sum of Plaintiff's payments appears to be $46,000, he believes that when the exchange rate is factored in, the total amount is closer to $45,000.[2]

---

[2] Defendants reject the facts related to Plaintiff's payments to Mr. Ijaz's nephews (Defendants do, however, accept that Plaintiff paid Mr. Ijaz $5,000 in cash). They assert that Mr. Ijaz did *not* want to be paid in Pakistani rupees, that he only provided Plaintiff with the names of his nephews to demonstrate a "close familial connection" between Mr. Ijaz and Plaintiff because they each had family residing in the same city in Pakistan, that Mr. Ijaz never requested Plaintiff send payment for the gas station to his cousins, that Plaintiff never paid Mr. Ijaz's nephews, and that any money Plaintiff did pay to the nephews was unrelated to the purchase of a gas station. In light of the testimony and documents admitted at trial, these factual assertions are not believable.

For one, documents admitted at trial support Plaintiff's account. Text messages between Plaintiff and Mr. Ijaz that

3

Plaintiff incurred a number of costs in moving to Pennsylvania and attempting to acquire Defendants' business. With the help of Mr. Ijaz and Mr. Ijaz's accountant, Plaintiff filed in Pennsylvania to incorporate his new business. Plaintiff paid Mr. Ijaz $550 for his assistance. Plaintiff also sold his limousine and taxi medallion for $7,000 and $3,000 respectively.[3]

_____

were admitted into evidence indicate that Mr. Ijaz requested that Plaintiff "give" one of his cousins "6 lack" (the parties agree that a "lack" refers to a particular amount of Pakistani rupees, but disagree about how many United States dollars are the equivalent of one "lack"). Other text messages show Plaintiff and Mr. Ijaz discussing the exchange rate between the rupee and the dollar, and contemplating a future payment in rupees. Additionally, a document signed by one of Mr. Ijaz's nephews states that the nephew received a payment of rupees through Plaintiff (this document was only entered into evidence for the purpose of showing that the nephew was working with Mr. Ijaz to receive money overseas).

Defendants' principal argument with respect to these documents keys in on Mr. Ijaz's statement in one of the text messages that the exchange rate on a particular day was "to[o] much," which Defendants infer means that Mr. Ijaz did not want to be paid in rupees at all. This is not the most plausible reading of the text messages; rather, the most plausible reading is that the parties were deciding whether the payment in rupees should be made on the day they were discussing at the exchange rate on that day, or whether they should put off the transaction until the exchange rate became more favorable.

Even less plausible is Mr. Ijaz's explanation for why the text messages show Mr. Ijaz providing his nephews' contact information to Plaintiff and requesting that "6 lack" be transferred to them. Mr. Ijaz testified that Plaintiff requested Mr. Ijaz do him the "favor" of sending the "6 lack" text so that Plaintiff could "show [Plaintiff's otherwise unnamed 'friend' that Plaintiff] bought this business"—that is, the gas station—in order to encourage the friend to pay money to Plaintiff. Mr. Ijaz also testified that the nephews' contact information was provided for the separate reason of proving to Plaintiff that both Mr. Ijaz and Plaintiff had family members from the same city in Pakistan— that is, a "close familial relation." These explanations are convoluted, internally contradictory, and simply not believable.

Defendants also assert that there is "no evidence" that establishes Mr. Ijaz's nephews received the payments that Plaintiff says he sent to them. This contention is mistaken, as Plaintiff's testimony is evidence in and of itself. *See United States v. Crooks*, 337 F. App'x 159, 162 (3d Cir. 2009) (citing *United States v. McGlory*, 968 F.2d 309, 347 (3d Cir. 1992)). Moreover, although not every fact to which Plaintiff testified found direct support in the documentary evidence, none of his testimony was contradicted by the documentary evidence, and his testimony was generally plausible and internally coherent—lending further credibility to his testimony.

Finally, it bears noting that, at times, Defendants do not appear to deny that Plaintiff in fact made the payments Plaintiff said he made to Mr. Ijaz's nephews. Aside from Plaintiff's version of the facts, no plausible explanation for why Plaintiff would have made those payments has been offered.

Because Defendants' version of these facts is unsupported by the documentary evidence and reliant on testimony that is not credible, Defendants' version is rejected.

[3] Because Plaintiff has not provided the receipts for the sales, Defendants "reject" that Plaintiff sold his limousine and medallion for the amounts he claims. The Court finds Plaintiff's testimony that he did sell them for $7,000 and $3,000 respectively to be credible, and it accepts that testimony as true.

Additionally, Plaintiff rented a home in Pennsylvania for $750 per month having put down a security deposit in mid-September.

On September 16, Plaintiff and Mr. Ijaz met at the gas station. That day, Mr. Ijaz informed Plaintiff that, contrary to the representations Mr. Ijaz made during their first conversation, the convenience store inventory and gas in the tanks as of that day had not been included in the payment Plaintiff made for the gas station—rather, to purchase those items, Plaintiff would need to pay an additional $42,000. Plaintiff asserts that, despite having been misled, he would have been willing to pay the additional $42,000 if it meant that he would take ownership of the gas station and all of its gas and inventory. Plaintiff and Mr. Ijaz agreed that Plaintiff would pay the $42,000 on September 23.[4]

Mr. Ijaz then handed Plaintiff the keys to the gas station, and informed Plaintiff that Mr. Ijaz's attorney was preparing a written contract that would memorialize the sale of the gas station. Mr. Ijaz then left the gas station.

### B. Plaintiff Operates the Gas Station

Plaintiff operated the gas station from September 16 through September 22. During that time, his daily revenue from the convenience store was between $130 and $150 per day and he sold gas for about $2,500 over the course of the week. Several events of note occurred during this period.

First, at some point Plaintiff realized that Mr. Ijaz had not changed the bank account linked to the gas pumps, so whenever a customer paid for gas by credit card, the payment was

---

[4] In purporting to "reject" some of these facts (it is not entirely clear which specific facts), Defendants assert that Plaintiff agreed to pay the $42,000. But Plaintiff does not contend otherwise. Plaintiff's contention is that he had been told initially that his prior payment covered inventory and gas, but once Mr. Ijaz told him otherwise, Plaintiff was willing to pay the second sum of $42,000 that Mr. Ijaz requested.

placed in Mr. Ijaz's account, not Plaintiff's. Plaintiff asked Mr. Ijaz to change the account, and Mr. Ijaz agreed but said that it would take a few days; the account was never changed.[5] Eventually, Plaintiff placed a "cash only" sign on the gas pump.

Second, Plaintiff recognized that the convenience store was largely unstocked. He therefore purchased a variety of inventory to refill the shelves, which cost him approximately $4,000.[6]

Third, on September 19, Mr. Ijaz provided Plaintiff with what Mr. Ijaz represented to be the written memorialization of their agreement. The written agreement—which the parties refer to as the "management agreement"—stated that Plaintiff would have no ownership interest in the gas station, and that Plaintiff would instead serve as an independent contractor. The management agreement was not indefinite (as Plaintiff had previously understood his ownership interest in the gas station would be), but rather would end on a fixed date. Moreover, the management agreement gave either party the unilateral right to terminate the written agreement without cause (with 90 days' notice). Plaintiff did not sign the agreement.[7]

---

[5] Defendants state that the parties never agreed that "all sales would immediately inure to Plaintiff" and that "[b]ecause Defendant had purchased the gasoline in the ground, it was agreed that Defendant would receive the profit on gas sales." Defendants' factual assertion is contradicted by testimonial and documentary evidence in the record. Both Plaintiff and Mr. Ijaz testified that they understood Plaintiff to be paying for the gas in the ground based on the forthcoming $42,000 payment (although Plaintiff also contends that Mr. Ijaz had agreed to sell him the gas in the ground as part of the initial $45,000 payment). And the "inventory" entered into evidence that calculates Plaintiff's $42,000 payment includes gas.

[6] Defendants reject this fact because Plaintiff did not bring the receipts for the purchase with him to trial. The Court accepts Plaintiff's testimony as credible. The Court further notes that Defendants do not appear to have requested that Plaintiff bring such documents with him when he testified.

[7] Defendants claim that the contents of this management agreement were discussed with Plaintiff before it was presented to Plaintiff on September 19; they state that the impetus for this independent contracting agreement was the parties' understanding that Defendants' lease on the property where the gas station was located included a clause requiring their landlord's assent to any sublease arrangement. They further claim that Plaintiff understood that any sale of the business was contingent on Defendants' landlord agreeing to a sublease of the property to Plaintiff, and that the landlord had communicated to Defendants that she would not assent to any sublease. And, at times, Defendants indicate that defining Plaintiff as an independent contractor was done at Plaintiff's own suggestion.

Defendants' story here is not believable. For Mr. Ijaz's testimony to be true, it would mean that Plaintiff acted

Fourth, on September 22, at 9:00 pm Plaintiff called Mr. Ijaz and indicated that the language of the agreement needed to be changed. Mr. Ijaz told Plaintiff he could not talk because it was too late in the evening.

### C. Mr. Ijaz Ejects Plaintiff from the Gas Station

On the morning of September 23, when Plaintiff arrived at the gas station, to Plaintiff's surprise, Mr. Ijaz was already there. Most of Plaintiff's personal belongings were on the floor. But the cash Plaintiff had been storing at the convenience store was missing: $3,500 from sales for the week, and $7,000 that Plaintiff had brought with him at the beginning of the week from the sale of his limousine. Plaintiffs business receipts were also missing.[8] Plaintiff began to call the police, but Mr. Ijaz asked him not to do so. Mr. Ijaz told Plaintiff that he no longer wanted to sell Plaintiff the gas station, but that he would return all of Plaintiff's money within two days. In the end, however, Mr. Ijaz did not return any of the money that Plaintiff had paid him, did not return any of the money that had been stored in the office the previous night, and did not allow Plaintiff to take his inventory with him. Eventually Mr. Ijaz asked Plaintiff to leave the gas station. Plaintiff complied, and did not return.[9]

---

repeatedly against his own self-interest for no discernible reason. Moreover, because Mr. Ijaz's story and Plaintiff's story are incompatible with one another, one of the parties must be testifying falsely. As the Court has already found that Mr. Ijaz has testified numerous times in ways that contradict the written evidence in the record and that are internally inconsistent, whereas Plaintiff testified consistently and believably, the Court determines here that Plaintiff's version of the facts is more truthful.

[8] Defendants reject both the idea that Plaintiff did not expect Mr. Ijaz to be at the store that morning, and that any money was missing. As to Mr. Ijaz's presence at the store, Defendants claim that Mr. Ijaz had told Plaintiff that he wanted to talk in person about the "cash only" sign that Plaintiff had placed on the gas pump. As to the missing money, Defendants state that there was "no evidence produced at trial" to support the claim that money was missing. On both issues, the Court credits Plaintiff's account.

With respect to Mr. Ijaz's presence at the store, it is not credible to suggest that the parties would have agreed to discuss the "cash only" sign when the parties had already agreed that Plaintiff had purchased the gas in the ground and therefore was entitled to payment from customers who purchased that gas. With respect to the missing money, it is not correct that there was "no evidence" produced at trial. Plaintiff's credible testimony is evidence that supports the claim that money was missing.

[9] Defendants argue that Mr. Ijaz allowed Plaintiff to take any inventory and records that Plaintiff wanted. In support

### D.  The Aftermath

Two days after Mr. Ijaz reoccupied the gas station and Plaintiff left, Plaintiff called Mr. Ijaz repeatedly, but Mr. Ijaz did not answer the phone.  Plaintiff and Mr. Ijaz then exchanged numerous text messages.  Plaintiff stated he had been promised repayment within two days and had not received it, and he told Mr. Ijaz that he would come to the gas station the next day to pick up the money.  Mr. Ijaz responded requesting Plaintiff stop contacting him, telling him not to come to the gas station, and warning that he would call the police if Plaintiff pursued the matter further.  Plaintiff continued to demand his money back, growing increasingly agitated.  Mr. Ijaz continued threatening to call the police.  After Plaintiff left, he was without a job for two months.  He eventually bought a new car for $35,000 and began driving again.  He has not been able to purchase another medallion.  Plaintiff has not been able to pay back his brother for the initial loan made to purchase the gas station.[10]

In October 2016, after all of the events described above, Mr. Ijaz placed the same ad in the *Urdu Times* that had initially piqued Plaintiff's attention.

## II.  PROCEDURAL HISTORY

Plaintiff filed suit against Defendants on May 4, 2018.  An Amended Complaint was filed in August 3, 2018, which Defendants answered shortly thereafter.  The parties stipulated to waiver of a jury trial, and a bench trial was held on May 6, 2019.  Plaintiff then submitted proposed findings of fact and conclusions of law; Defendants responded, and Plaintiff replied.

## III.  DISCUSSION

---

of this assertion, Defendants rely largely on Exhibit 21, which consists of several photographs that Defendants claim were taken on September 23.  But these photos show nothing more than Plaintiff holding a box that appears to contain 3-4 beverage bottles in it—it is hardly probative of whether Plaintiff took inventory and records with him.

[10] Defendants reject several of these facts because there is "no evidence" of them; these facts include that Plaintiff purchased a new car for $35,000 and that there was a loan made to Plaintiff by Plaintiff's brother.  Plaintiff's credible testimony on both points constitutes evidence.

Plaintiff asserts five counts against Defendants: fraud; breach of contract; unjust enrichment, minimum wage and overtime violations under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*; and violations of Pennsylvania's Wage Payment and Collection Law, 43 Pa. C.S.A. § 260.9a(b).

Before each count is addressed, however, a preliminary note is in order. Although Plaintiff has brought these counts against both Mr. Ijaz and Mrs. Ijaz, the evidence entered at trial describes only conduct engaged in by Mr. Ijaz. Because no facts have been found relating to Mrs. Ijaz's conduct, and because no legal argument has been made that she should be responsible for her husband's conduct, she cannot be found liable for any legal violations. *See Connolly v Oquendo*, 2013 WL 4051320, at *4 (E.D. Pa. Aug. 9, 2013). Therefore, the following discussion relates only to Mr. Ijaz's liability.

### A. Fraud

To prove fraud in Pennsylvania, Plaintiff must establish the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994).

Plaintiff focuses on two set of representations made by Mr. Ijaz: (1) that the gas station was for sale and that Defendants intended to sell it, and (2) that the gas station was as profitable as he claimed it to be, to wit, that average daily sales from the convenience store were between $1,200 and $1,400, and that average daily gas sales were 3,000 gallons. These representations will be addressed in turn.

### i. Whether Gas Station was for Sale

Begin with Mr. Ijaz's statements that the gas station was for sale and that Defendants intended to sell it. The parties do not dispute that this was a "representation" or that it was "material to the transaction." The parties do, however, dispute whether the statement was false and whether Defendants intended to deceive Plaintiff.

Significant evidence entered into the record at trial supports findings of falsity and intentionality. The advertisement in the *Urdu Times* mentions only a "sale," and does not contemplate any other arrangement—it mentions neither a sublease nor an independent contractor. Further, Plaintiff credibly testified that the parties discussed a sale of the gas station during their initial conversations. And Plaintiff's behavior when he received Defendants' proposed "management agreement"—that is, Plaintiff's refusal to sign—is consistent with the behavior of a person who had been told that he was agreeing to buy the business, not to function as an independent contractor. Finally, the fact that Defendants re-placed the advertisement in the *Urdu Times* after the parties' relationship collapsed is highly probative of intentionality. That Defendants would re-place an advertisement they knew was false—based on Mr. Ijaz's claim that the landlord refused to countenance the sublease to Plaintiff—is highly probative of Defendants' intent to deceive when the advertisement was placed the first time.

Defendants make the same two arguments as to both falsity and intentionality. First, they state that Plaintiff "was aware of the lease restrictions which prevented subleasing." But Plaintiff's credible testimony undermines this assertion. Plaintiff testified that he was not aware of the lease restrictions and that Mr. Ijaz did not inform him of the restriction when the parties negotiated the sale or when Plaintiff assumed control of the gas station on September 16. Moreover, the language of the "management agreement," which allows for Defendants to unilaterally terminate—without cause—the agreement at any time, goes far beyond complying

with the landlord's refusal to permit a sublease; instead, the "management agreement" would have made Plaintiff's livelihood dependent on Defendants' good graces.

Second, Defendants argue that Mr. Ijaz "could not predict whether his landlord would withhold her consent to the sublease." This argument is particularly unpersuasive given Defendants' decision to re-place the advertisement in the *Urdu Times*. If Defendants placed the advertisement after the parties' relationship collapsed—that is, knowing that they could not "sell" the business because the landlord would not agree to a sublease—it supports the inference that they also knew they could not "sell" the business the first time they placed the advertisement.

Defendants additionally assert that Plaintiff's reliance was not "justifiable." In Pennsylvania, "justifiable reliance" means that a plaintiff may not "rely[] upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious." *Toy v. Metropolitan Life Ins. Co.*, 928 A.2d 186, 207 (Pa. 2007). Record evidence indicates Plaintiff had no knowledge of the representations' falsity and that the falsity was not obvious. Defendants told Plaintiff that they intended to sell him the gas station, and Plaintiff accepted that claim. Defendants' sole argument on this question is to assert that Plaintiff's reliance was not justified because "Plaintiff is the more sophisticated party as he . . . has been living in the United States for over 30 years, whereas [Defendants] only first came to the United States in 2001." This argumentation is, at best, inapposite. And it certainly does not overcome the fact, by the time the events at issue in this case took place, Defendants had bought, owned, operated, and sold between 10 and 15 gas stations in the United States, while Plaintiff had never been involved in the gas station business. Simply put, the findings of fact in this case indicate that Plaintiff did not know, and had no reason to know, that Defendants' representations were false.

Finally, Defendants argue that there was no "injury." Plaintiff, however, has proved injury in the form of the $45,000 that he paid Mr. Ijaz for the business, the $7,000 that Mr. Ijaz took from the gas station office when he ousted Plaintiff from the premises on September 23, and the $4,000 in merchandise that Plaintiff purchased for the convenience store. Defendants offer little legal argument to the contrary—they only dispute the underlying facts that the Court has already found.[11] As the Court has found that the evidence supports these factual findings, this tactic cannot succeed. Defendants also contend that the $45,000 in question "was Plaintiff's brother's money, not Plaintiff's money." This statement is unpersuasive; Plaintiff testified that his brother provided him with the $45,000 as an interest free loan in order to purchase the gas station.

### ii. Profitability of Gas Station

Turning now to whether the gas station was as profitable as Defendants represented it to be: The parties again do not dispute that the statements at issue were "representations" that were "material to the transaction at hand." *Gibbs*, 647 A.2d at 889.

As to "falsity," the Court accepts—as noted in the findings of fact—that Mr. Ijaz represented to Plaintiff that the convenience store sales (other than gas sales) averaged $1,200 to $1,400 daily, and about 3000 gallons of gas were sold daily. By a preponderance of the evidence, the Court concludes that these statements were false. There are two reasons for this conclusion. First, Plaintiff testified that convenience store sales were between $130 to $150 daily during the week he worked there and that he made somewhere in the range of $2,500 in gas sales during the week. The difference in sales Plaintiff claims to have made in the week he ran

---

[11] For example, Defendants state that there is "no evidence that Mr. Ijaz removed Plaintiff's personal belongings, inventory or cash," and that there is "no documentary evidence to establish that Plaintiff spent $4,000 on inventory[.]"

the business and the average sales Mr. Ijaz represented to Plaintiff is large enough to support the inference that Mr. Ijaz's representation was untruthful—that is, it is unlikely that Plaintiff simply experienced a "down week" orders of magnitude worse than the average week. Second, the Court generally credits Plaintiff's testimony and generally disbelieves Mr. Ijaz's testimony, for reasons already discussed.

Defendants' argument relating to falsity is to assert that "Plaintiff performed his due diligence and was permitted to inspect the business's records" and that "[t]here was no guarantee as to the profitability of the business." This contention, however, does not get to the heart of the matter. The question is whether the representations that Mr. Ijaz made to Plaintiff—through the business's records or otherwise—were truthful. Defendants have not provided credible evidence that the business records or Mr. Ijaz's oral representations were indeed truthful. In sum, the Court concludes that Defendants' statement as to the profitability of the gas station were false.

As to whether the misrepresentations were "intentional," the nature of the misrepresentation itself leads to the conclusion that it was intentionally made. The misrepresentation helps Defendants and hurts Plaintiff. The scale of the misrepresentation is so large as to make it unlikely to have happened by accident. And, in light of the Court's finding that Mr. Ijaz proved willing to intentionally mislead Plaintiff on other matters (namely, whether the business was for sale), it becomes more likely that he would have intentionally misled Plaintiff on this matter as well. In any event, Defendant makes no affirmative argument as to whether the misrepresentation was unintentional, choosing instead to argue only that there was no misrepresentation at all.

As to whether Plaintiff "justifiably relied" on the misrepresentations about the profitability of the gas station, the facts found again support the conclusion that he did. Plaintiff

testified that he "trust[ed]" Mr. Ijaz's representations about the business, and based on the evidence entered at trial, there was no reason for Plaintiff not to have done so. The extent of Defendants' argument to the contrary is to repeat that Plaintiff "should have known that profitability of a business is not guaranteed." But again, Plaintiff does not contend that he relied upon Mr. Ijaz's assertions about forward-looking profitability; rather, he argues that he relied on Mr. Ijaz's false representations about the gas station's past profitability. That reliance was justifiable.

Lastly, turning to injury, the parties make the same arguments that they made about injury Plaintiff suffered as a result of the misrepresentations about whether the business was for sale. For the same reasons as in that context, Plaintiff was injured by Defendants' misrepresentations about the profitability of the business.

Therefore, Plaintiff has proven his claim of fraud.[12]

## B. Breach of Contract

To prove breach of contract in Pennsylvania, Plaintiff must prove: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). The existence of a contract requires "an offer, an acceptance, and consideration." *Maintenance Specialties, Inc. v. Gottus*, 314 A.2d 279, 286 (Pa. 1974).

Here, a contract existed. The evidence shows that Mr. Ijaz offered to sell Plaintiff the gas station for $45,000, Plaintiff accepted that offer, and Plaintiff conveyed consideration in the form of money to Mr. Ijaz. That contract was breached when Mr. Ijaz ejected Plaintiff from the gas station on September 23. And Plaintiff incurred damages when he paid Mr. Ijaz money that was

---

[12] As already noted, only Defendant Mohammad Ijaz is liable for fraud—Defendant Shaista Ijaz is not liable.

never returned and when he paid money in order to move to Pennsylvania to begin operation of the gas station.

Defendants make two arguments in opposition. First, they argue that "Plaintiff did not pay $45,000 to Mr. Ijaz." However, as noted in the Findings of Fact, the Court has determined that Plaintiff did indeed pay $45,000 to Mr. Ijaz. Second, Defendants state that "[a]lthough both parties manifested an inten[t] to be bound, this was frustrated when Mr. Ijaz's landlord withheld consent to sublease the property to Plaintiff." Put most generously, Defendants' argument is one of "impossibility of performance." That is, it is not an argument that no contract was formed, but rather an argument that the breach should be excused. But in Pennsylvania, "an act of a third party that makes performance of a contract impossible will not excuse performance if it is foreseeable and not provided for in the contract." *Int'l Bhd. of Firemen & Oiler, Local 1201, AFL-CIO v. Bd. of Educ. of Sch. Dist. of Phila.*, 457 A.2d 1269, 1271 (Pa. 1983). Even accepting *arguendo* Defendants' version of the facts, Defendants have offered no reason why the landlord's refusal was not "foreseeable." Further, the Court does not credit Defendants' version of the facts, including the contention that Defendants subjectively intended to comply with the terms of the contract.

Therefore, Plaintiff has proven a breach of contract.[13]

### C. Unjust Enrichment

Plaintiff argues that even if there were no contract established, he would still recover under the equitable doctrine of unjust enrichment. However, unjust enrichment "applies only to situations where there is no legal contract." *Wingert v. T.W. Phillips Gas & Oil Co.*, 157 A.2d

---

[13] As already noted, only Defendant Mohammad Ijaz is liable for breach of contract—Defendant Shaista Ijaz is not liable.

92, 105 (Pa. 1959); *see also Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006).

Here, a contract was formed, and therefore unjust enrichment is inapplicable.

### D. Fair Labor Standards Act

The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), requires covered

employers to pay their employees both the federal minimum wage of $7.25 for all hours worked,

and an additional premium of one and one-half their ordinary rate of pay for all hours worked in

excess of forty hours per week. *Id.* at §§ 206(a), 207(a)(1). Plaintiff contends that during the

week he worked at the gas station, he was in actuality an employee working for Defendants, who

were employers—and that Defendants owe him minimum wage and overtime backpay for his

labor.

To determine whether an employer is covered by the FLSA, the Third Circuit instructs

courts to employ an "economic realities" test. That test requires consideration of "1) the alleged

employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority

to promulgate work rules and assignments and to set the employees' conditions of employment:

compensation, benefits, and work schedules, including the rate and method of payment; 3) the

alleged employer's involvement in day-to-day employee supervision, including employee

discipline; and 4) the alleged employer's actual control of employee records, such as payroll,

insurance, or taxes." *In re Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, 683

F.3d 462, 469 (3d Cir. 2012). The test also allows for consideration of "other indicia of

'significant control.'" *Id.* at 470.

The evidence introduced at trial dictates the conclusion that Mr. Ijaz was not an

employer. No evidence indicated that Mr. Ijaz "promulgate[d] work rules and assignments," "set

. . . compensation, benefits, and work schedules," engaged in any "supervision" or "discipline,"

or had "control of employee records." *Id.* at 469. On the other hand, the fact that Mr. Ijaz ultimately ejected Plaintiff from the gas station conceivably could be construed as exercising "authority to . . . fire." *Id.* But even that conclusion would be tenuous, given that the evidence established that the parties had agreed that Plaintiff would own and operate the gas station on his own. The more compelling reading of that event is that Mr. Ijaz was reneging on a prior agreement, not that Mr. Ijaz was "fir[ing]" Plaintiff. Finally, there are no "other indicia of 'significant control,'" that would indicate that Mr. Ijaz was an employer.

Because Mr. Ijaz was not an employer under the FLSA, he cannot be liable under the FLSA.

### E.  Pennsylvania Wage Payment and Collection Law

Under the Pennsylvania Wage Payment and Collection Law ("WPCL"), employees may sue to recover "unpaid wages and liquidated damages" from employers. 43 Pa. C.S.A. § 260.9a(b). However, "a prerequisite for relief under the WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid. . . . Relief under the WPCL is implausible without the existence of a contract." *Razak v. Uber Techs., Inc.*, 2016 WL 5874822, at *9 (E.D. Pa. Oct. 7, 2016). In other words, the WPCL "provides employees with a statutory remedy to recover wages and other benefits that are contractually due to them." *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 204 (Pa. 1997).

Here, Defendants correctly assert that "there was no evidence of a contract for wages to be paid" to Plaintiff. Rather, the parties agreed that Plaintiff would buy the gas station from Defendants. Because there was no contractual right for Plaintiff to receive wages, the WPCL claim must fail.

### F.  Damages

Plaintiff requests compensatory and punitive damages based on the common law fraud claim that he has proven.[14]

### i. *Compensatory Damages*

The measure of compensatory damages under Pennsylvania law is "actual loss." *Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. 1983). "The victim is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations" that formed the basis for the fraud. *Id.* However, "the fact-finder . . . may not render a verdict based on speculation or guesswork," and therefore the plaintiff must "furnish . . . a reasonable quantity of information from which the fact-finder may fairly estimate the amount of damages." *Id.*

Plaintiff argues that his "actual loss" constituted "the $45,000 paid to Defendant and his family for the business, the $7,000 of Plaintiff's that Defendant took from the office on September 23, 2016, . . . $4,000 in merchandise that Plaintiff purchased for Defendant's convenient store, . . . $750 in rent Plaintiff would have never paid had Defendant not induced him to purchase the gas station, . . . $[35,000] for the car, and $3,000 for the medallion."[15]

An award of the $45,000 paid to Defendant, the $7,000 taken by Defendant, and the $4,000 in merchandise purchased by Plaintiff is appropriate, as these sums represent "actual losses" to Plaintiff, and Plaintiff has offered "reasonable" proof as to their value. Plaintiff will

---

[14] Plaintiff also requests attorneys' fees based on his claims under the FLSA and WPCL. Because those claims fail on their merits, Plaintiff's request for attorneys' fees will be denied.

[15] The extent of Defendants' arguments in opposition to these awards is that there is "no evidence" that Plaintiff lost the money he claims he lost. This contention is unavailing; the Court found in its Findings of Fact that indeed Plaintiff paid the money he testified that he paid.

not be able to enjoy the benefit of those sums because he relied upon Defendants' false representations.

But an award of the $750 in rent, $35,000 for Plaintiff's car, and $3,000 for the medallion, are not appropriate bases for compensatory damages. For one, these sums do not represent "losses" because Plaintiff received value in exchange for his payments. In exchange for $750, he received a place to live, in exchange for selling his limousine he received $7,000 and separately in exchange for $35,000 he received a new limousine, and in exchange for his medallion he received $3,000. To receive these sums again would represent a windfall. For another, Plaintiff has not provided sufficient "information from which the fact-finder may fairly estimate the amount of damages." *Id.* Plaintiff has not shown, for example, that the difference in price of his new limousine compared to the one he sold was not driven solely by his own decision to purchase a more valuable limousine when he returned to New York after the events described in this case.

Therefore, Plaintiff will be awarded $56,000 in compensatory damages.[16]

### ii. Punitive Damages

To award punitive damages in an action for fraud, "there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others." *Smith v. Renaut*, 564 A.2d 188, 193 (Pa. Super. 1989); *see also Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) ("Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.") (internal quotations

---

[16] Plaintiff also requests $550 in compensatory damages for the sum that he paid the accountant to incorporate his new business. However, this demand is only asserted in Plaintiff's Reply—not in his primary Proposed Findings of Fact and Conclusions of Law. As a result, Defendants were unable to respond to the request in their own filing. The request will therefore be denied. *See, e.g.*, *Bishop v. Sam's East, Inc.*, 2009 WL 1795316, at *5 (E.D Pa. June 23, 2009) (holding that arguments raised in a reply brief are waived).

omitted). "[T]he purpose of imposing punitive damages is to punish the wrongdoers and to deter future conduct." *Feingold v. Se. Pa. Transp. Auth.*, 517 A.2d 1270, 1276 (Pa. 1986).

Punitive damages are appropriate here. The evidence presented at trial supports the conclusion that Mr Ijaz's conduct was premeditated; that even before he met Plaintiff, he intended to defraud someone; that Mr. Ijaz specifically preyed on an immigrant community through the advertisement; that once Mr. Ijaz had met Plaintiff, he understood that he would be swindling a person approaching the end of his career (Plaintiff being advanced in age); that Mr. Ijaz was a sophisticated actor who was in the gas station business; and that Mr. Ijaz understood the consequences of their actions would be to uproot Plaintiff's life and cause him great hardship. These conclusions show a "wholly wanton disregard" of Plaintiff's rights. *Smith*, 564 A.2d at 193. Further, the decision to re-place the advertisement for the "sale" of the gas station in the *Urdu Times*—after the events at issue in this case had occurred—indicates that Mr. Ijaz may engage in similar conduct again. Punitive damages are therefore appropriate here to "deter" that "future conduct." *Feingold*, 517 A.2d at 1276.

The Court will award an additional $50,000 in punitive damages.

## IV.    CONCLUSIONS OF LAW

Pursuant to Federal Rule of Civil Procedure 52(a) and based on the foregoing discussion, the Court makes the following two conclusions of law:

1.  Defendant Mohammad Ijaz is liable for common law fraud, and consequently is liable to Plaintiff for $56,000 in compensatory damages and $50,000 in punitive damages.

2.  Defendant Mohammad Ijaz is liable for breach of contract.

An appropriate order follows.

August 12, 2019                    BY THE COURT:

                                   /s/Wendy Beetlestone, J.

                                   _____
                                   WENDY BEETLESTONE, J.